# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Philip G. Reinhard | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 50323 | **DATE** | 10/12/2004 |
| **CASE TITLE** | SALADINO vs. ENVIROVAC, INC. | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____ .

(3) ☐ Answer brief to motion due_____ . Reply to answer brief due_____ .

(4) ☐ Ruling/Hearing on _____ set for _____ at _____ .

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____ .

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____ .

(7) ☐ Trial[set for/re-set for] on _____ at _____ .

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____ .

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]   For the reasons stated in the attached Memorandum and Order, defendant's motion for summary judgment is granted.  This case is hereby dismissed in its entirety with prejudice.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | **Document Number** |
|---|---|---|---|---|
| | No notices required. | | number of notices 2 | |
| | Notices mailed by judge's staff. | | 10-13-04 | 21 |
| | Notified counsel by telephone. | | date docketed | |
| ✓ | Docketing to mail notices. | | docketing deputy initials | |
| ✓ | Mail AO 450 form. | | date mailed notice | |
| ✓ | Copy to judge/magistrate judge. ✓ | | | |
| /SEC | courtroom deputy's initials | 2004 OCT 12 PM 3:46 | 10-13-04 | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## WESTERN DIVISION

NICOLE A. SALADINO,         )
                         )
                Plaintiff,    )    Case No. 02 C 50323
                         )
          v.              )    Philip G. Reinhard
                         )    United States District Judge
ENVIROVAC, INC.,          )
                         )
                Defendant.   )

## MEMORANDUM AND ORDER

On August 14, 2002, plaintiff Nicole A. Saladino filed her two-count complaint against defendant Envirovac, Inc. Plaintiff's complaint states multiple claims – (1) sex discrimination (hostile work environment) in violation of Title VII, (2) retaliation in violation of Title VII, and (3) disability discrimination (failure to accommodate and disparate treatment) in violation of the Americans with Disabilities Act ("ADA") – and asks the court, *inter alia*, to award plaintiff actual damages, compensatory damages, punitive damages, attorneys' fees, and costs.[1]

On April 12, 2004, defendant filed a motion for summary judgment.

*Legal Standards – Summary Judgment*

Summary judgment will be granted only "when the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'"[2] *Cerutti v. BASF Corp.*, 349 F.3d 1055, 1060 (7th Cir. 2003) (quoting Fed. R. Civ. P. 56).

---

[1] Pursuant to 28 U.S.C. § 1331, the court has original jurisdiction over plaintiff's claims. *See* 28 U.S.C. § 1331. Venue is proper under 28 U.S.C. § 1391(b). *See* 28 U.S.C. § 1391(b).

[2] Of course, "[e]mployment discrimination cases are extremely fact-intensive" and the court is not "'obliged. . .to scour the record looking for factual disputes. . . .'" *Greer v. Bd. of*

In making this determination, the court must "constru[e] all facts. . .and draw[] all reasonable inferences from those facts. . .in favor of the. . .non-moving part[y]. . . ." *Id.* (citation omitted).

## Statement of Facts

The following facts are not in dispute. Defendant is a company located in Rockford, Illinois and engaged in the business of manufacturing vacuum and sewage collection systems for the transportation and building industry. (Def's L.R. 56.1(A)(3) Stmnt. of Mat. Facts, at ¶3.) From March 1999 to May 1999, defendant employed plaintiff as a temporary customer service representative. (Def's L.R. 56.1(A)(3) Stmnt. of Mat. Facts, at ¶9.) Defendant hired plaintiff in May 1999 as an order processing clerk. (Def's L.R. 56.1(A)(3) Stmnt. of Mat. Facts, at ¶8; Pl's Stmnt. of Add'l Mat. Facts, at ¶1; Def's Resp. to Pl's Stmnt. of Add'l Mat. Facts, at ¶1.) In that capacity, plaintiff prepared, entered, and/or processed (1) orders from the trains, supermarkets, aviation, marine, and repairs departments, (2) invoices, (3) PIC tickets for outgoing shipments, and (4) credit memoranda. (Def's L.R. 56.1(A)(3) Stmnt. of Mat. Facts, at ¶¶8, 10; Pl's Stmnt. of Add'l Mat. Facts, at ¶¶4-5; Def's Resp. to Pl's Stmnt. of Add'l Mat. Facts, at ¶4.) Plaintiff was also responsible for miscellaneous filing and performing various job functions for absent employees.[3] (Def's L.R. 56.1(A)(3) Stmnt. of Mat. Facts, at ¶10; Pl's Stmnt. of Add'l Mat. Facts, at ¶5.) During the course

---

*Educ. of the City of Chicago, Ill.*, 267 F.3d 723, 727 (7th Cir. 2001) (citation omitted). Instead, plaintiff "must present definite, competent evidence in rebuttal" if she wishes to successfully oppose defendant's motion. *Salvadori v. Franklin Sch. Dist.*, 293 F.3d 989, 996 (7th Cir. 2002) ("The mere existence of an alleged factual dispute is not sufficient to defeat a summary judgment motion.") (citation omitted). More specifically, plaintiff's evidence must be "sufficient to allow a jury to render a verdict in h[er] favor." *Basith v. Cook County*, 241 F.3d 919, 926 (7th Cir. 2001) (citation omitted).

[3]Plaintiff performed certain job functions normally performed by Sheila Kadet or Kim Rice when Kadet or Rice was absent. (Pl's Stmnt. of Add'l Mat. Facts, at ¶11; Def's Resp. to Pl's Stmnt. of Add'l Mat. Facts, at ¶11.)

of plaintiff's employment, she reported to the Contracts Department Manager, Dennis Tritt. (Def's L.R. 56.1(A)(3) Stmnt. of Mat. Facts, at ¶12; Pl's Stmnt. of Add'l Mat. Facts, at ¶¶2, 48.) Tritt also supervised Jennifer Beyer, Sheila Kadet, Kim Rice, and Billie Jo Johnson.[4] (Pl's Stmnt. of Add'l Mat. Facts, at ¶8; Def's Resp. to Pl's Stmnt. of Add'l Mat. Facts, at ¶8.) At the time plaintiff was hired, Tritt reported to Walt Peters. (Pl's Stmnt. of Add'l Mat. Facts, at ¶3; Def's Resp. to Pl's Stmnt. of Add'l Mat. Facts, at ¶3.) However, in 2001 Tritt reported to the Director of Business Planning, Doug Wallace. (Def's L.R. 56.1(A)(3) Stmnt. of Mat. Facts, at ¶13; Pl's Stmnt. of Add'l Mat. Facts, at ¶¶3, 42-43; Def's Resp. to Pl's Stmnt. of Add'l Mat. Facts, at ¶3.) In turn, Wallace reported to the President, Bob Schafer. (Def's L.R. 56.1(A)(3) Stmnt. of Mat. Facts, at ¶14.)

While employed by defendant, plaintiff received and reviewed defendant's employee manual and sexual harassment policy. (Def's L.R. 56.1(A)(3) Stmnt. of Mat. Facts, at ¶16.) Defendant's non-harassment policy is set forth in the employee manual and posted on employee bulletin boards; it includes a statement that (1) sexual harassment is not tolerated and (2) reports of the same will be investigated. (Def's L.R. 56.1(A)(3) Stmnt. of Mat. Facts, at ¶17; Pl's Stmnt. of Add'l Mat. Facts, at ¶62.) If an employee believes that he or she is the victim of harassment, defendant's policy directs that employee to alert his or her manager, defendant's Human Resources

---

[4]Beyer, Kadet, Rice, and Johnson were hired by defendant prior to the date that plaintiff was hired. (Pl's Stmnt. of Add'l Mat. Facts, at ¶8; Def's Resp. to Pl's Stmnt. of Add'l Mat. Facts, at ¶8.) Beyer was employed as a repair coordinator and Kadet worked as a spares coordinator for the marine department. (Pl's Stmnt. of Add'l Mat. Facts, at ¶¶6, 9.) Rice served as a Contracts Administrator and was responsible for marine department equipment. (Pl's Stmnt. of Add'l Mat. Facts, at ¶10; Def's Resp. to Pl's Stmnt. of Add'l Mat. Facts, at ¶10.) Johnson was a Customer Manager for supermarket equipment. (Pl's Stmnt. of Add'l Mat. Facts, at ¶7; Def's Resp. to Pl's Stmnt. of Add'l Mat. Facts, at ¶7.)

Manager[5], and/or defendant's president. (Def's L.R. 56.1(A)(3) Stmnt. of Mat. Facts, at ¶18; Pl's Stmnt. of Add'l Mat. Facts, at ¶62.)

Plaintiff claims that she engaged in a consensual, sexual relationship with Rick White from June 1999 until May 2001. (Def's L.R. 56.1(A)(3) Stmnt. of Mat. Facts, at ¶¶41, 46; Pl's Stmnt. of Add'l Mat. Facts, at ¶¶35, 37; Def's Resp. to Pl's Stmnt. of Add'l Mat. Facts, at ¶35.) White was defendant's Director of Operations. (Def's L.R. 56.1(A)(3) Stmnt. of Mat. Facts, at ¶35.) White was not plaintiff's supervisor, plaintiff's immediate supervisor did not report to White and White had no successive, supervisory authority over plaintiff. (Def's L.R. 56.1(A)(3) Stmnt. of Mat. Facts, at ¶36.) Additionally, Tritt had no input in the decision to terminate plaintiff and made no recommendation concerning that decision. (Pl's Stmnt. of Add'l Mat. Facts, at ¶60.) During the course of her relationship with White, plaintiff discussed their relationship with Nancy Kolar.[6] (Def's L.R. 56.1(A)(3) Stmnt. of Mat. Facts, at ¶42.) For example, plaintiff informed Kolar that White would come to her apartment and fondle her. (Def's L.R. 56.1(A)(3) Stmnt. of Mat. Facts, at ¶42.) These discussions were not in the nature of complaints by plaintiff. Plaintiff also claims that White was having an affair with Bob Schafer's daughter, Stacy Schafer, during the time period that plaintiff and White were engaged in their sexual relationship. (Pl's Stmnt. of Add'l Mat. Facts, at ¶36; Def's Resp. to Pl's Stmnt. of Add'l Mat. Facts, at ¶36.) When asked why she would continue

---

[5]During all relevant time periods, Nancy Kolar served as defendant's Human Resources Manager. (Def's L.R. 56.1(A)(3) Stmnt. of Mat. Facts, at ¶15; Pl's Stmnt. of Add'l Mat. Facts, at ¶61.)

[6]Based on information provided by plaintiff, Kolar understood plaintiff's relationship with White to be consensual. (Def's L.R. 56.1(A)(3) Stmnt. of Mat. Facts, at ¶¶42, 44.) However, Kolar never witnessed any action or event that would substantiate the existence of the relationship. (Def's L.R. 56.1(A)(3) Stmnt. of Mat. Facts, at ¶¶42, 44.)

her relationship with White in light of White's relationship with Stacy Schafer, plaintiff indicated to Kolar that she was not concerned with White's affair with Stacy Schafer. (Def's L.R. 56.1(A)(3) Stmnt. of Mat. Facts, at ¶43.)

Plaintiff perceived defendant's office as an open office for sexual jokes and comments. (Def's L.R. 56.1(A)(3) Stmnt. of Mat. Facts, at ¶40; Pl's Stmnt. of Add'l Mat. Facts, at ¶32; Def's Resp. to Pl's Stmnt. of Add'l Mat. Facts, at ¶32.) In support, plaintiff claims that another individual employed by defendant, Sandy Nichols, informed her that White had asked to see Nichols' breasts while White and Nichols were in a conference room together. (Pl's Stmnt. of Add'l Mat. Facts, at ¶33; Def's Resp. to Pl's Stmnt. of Add'l Mat. Facts, at ¶33.) Furthermore, plaintiff stated that White would grab plaintiff's breasts at the office. (Pl's Stmnt. of Add'l Mat. Facts, at ¶34; Def's Resp. to Pl's Stmnt. of Add'l Mat. Facts, at ¶34.)

Because she was performing her job in a satisfactory manner, plaintiff received a favorable evaluation from Tritt and a pay increase in May 2000. (Pl's Stmnt. of Add'l Mat. Facts, at ¶¶49-50.) In early-January 2001, plaintiff spent a weekend in the hospital because she was fatigued and "felt kind of out of whack." (Def's L.R. 56.1(A)(3) Stmnt. of Mat. Facts, at ¶58.) Following her stay in the hospital, plaintiff was absent from work for approximately two weeks. (Def's L.R. 56.1(A)(3) Stmnt. of Mat. Facts, at ¶58.) Plaintiff also missed several other days of work during that same month. (Def's L.R. 56.1(A)(3) Stmnt. of Mat. Facts, at ¶59.) On February 1, 2001, plaintiff's job title was changed to aviation spare parts coordinator. (Def's L.R. 56.1(A)(3) Stmnt. of Mat. Facts, at ¶11; Pl's Stmnt. of Add'l Mat. Facts, at ¶13.) From February 5, 2001 through February 19, 2001, plaintiff was again absent from work because she was "suffering from abdominal pain of unknown cause." (Def's L.R. 56.1(A)(3) Stmnt. of Mat. Facts, at ¶60.) She was released

to return to work without restriction on February 19, 2001. (Def's L.R. 56.1(A)(3) Stmnt. of Mat. Facts, at ¶61.)

In April 2001, White and Stacy Schafer began living together and plaintiff decided to end her relationship with White.[7] (Def's L.R. 56.1(A)(3) Stmnt. of Mat. Facts, at ¶¶45, 47.) Plaintiff's decision was driven by her (1) belief that White's involvement with both her and Stacy Schafer was negatively affecting White's children and (2) fear that she would be fired if Stacy Schafer learned of White's relationship with plaintiff. (Def's L.R. 56.1(A)(3) Stmnt. of Mat. Facts, at ¶47.) In addition to ending her relationship with White, plaintiff claims that she unequivocally informed him that she did not want him to telephone her or visit her home again. (Def's L.R. 56.1(A)(3) Stmnt. of Mat. Facts, at ¶48.) Nevertheless, plaintiff stated that from May 2001 through July 2001 White would, *inter alia*, touch her breasts at the office and remark to plaintiff that "her ass looks nice in that skirt," "oh, you got nice tits," "oh, you know you want me," "Oh, I miss you," and "I want to be with you." (Def's L.R. 56.1(A)(3) Stmnt. of Mat. Facts, at ¶¶49-50.)

In May 2001, plaintiff once again received a satisfactory evaluation from Tritt. (Pl's Stmnt. of Add'l Mat. Facts, at ¶51.) In fact, plaintiff was never formally disciplined while employed by defendant. (Pl's Stmnt. of Add'l Mat. Facts, at ¶¶52, 68.) In the summer of 2001, plaintiff "started having abnormal ways about [herself]" and visited the hospital on four occasions. (Def's L.R. 56.1(A)(3) Stmnt. of Mat. Facts, at ¶62.) She was not admitted during any of her four visits. (Def's L.R. 56.1(A)(3) Stmnt. of Mat. Facts, at ¶63.)

---

[7]White and Stacy Schafer eventually married. (Pl's Stmnt. of Add'l Mat. Facts, at ¶36.)

Plaintiff began having seizures in June 2001.[8] (Def's L.R. 56.1(A)(3) Stmnt. of Mat. Facts, at ¶64; Pl's Stmnt. of Add'l Mat. Facts, at ¶14; Def's Resp. to Pl's Stmnt. of Add'l Mat. Facts, at ¶14.) Plaintiff explained that she is unable to walk during her seizures and that she "moves slower" immediately after her seizures because of the physical pain she experiences. (Def's L.R. 56.1(A)(3) Stmnt. of Mat. Facts, at ¶¶78-79.). However, plaintiff also stated that even though she occasionally cancels plans and is absent from work, she does not have any limitations as a result of her seizures other than those that are self-imposed. (Def's L.R. 56.1(A)(3) Stmnt. of Mat. Facts, at ¶¶77-78.) After being diagnosed with pseudoseizures, plaintiff was granted a leave of absence in July 2001 pursuant to defendant's Family Medical Leave policy.[9] (Def's L.R. 56.1(A)(3) Stmnt. of Mat. Facts, at ¶¶5, 57, 66, 70; Pl's Stmnt. of Add'l Mat. Facts, at ¶¶12, 15-17; Def's Resp. to Pl's Stmnt. of Add'l Mat. Facts, at ¶¶12, 17.) Plaintiff remained on paid, short-term disability leave for approximately eight to ten weeks. (Def's L.R. 56.1(A)(3) Stmnt. of Mat. Facts, at ¶67.) However, plaintiff's physicians were unable to identify the cause of her seizures. (Def's L.R. 56.1(A)(3) Stmnt. of Mat. Facts, at ¶68.) On September 17, 2001, plaintiff's psychologist extended plaintiff's leave of absence, indicating that plaintiff had been diagnosed with anxiety and bipolar disorders and would not be able to return to work until December 15, 2001. (Def's L.R. 56.1(A)(3) Stmnt. of Mat. Facts, at ¶69; Pl's Stmnt. of Add'l Mat. Facts, at ¶¶17-18; Def's Resp. to Pl's Stmnt. of Add'l Mat. Facts, at ¶17.)

---

[8]Plaintiff discussed her seizures with Kolar, and, on one occasion, Kolar witnessed plaintiff lying on the floor with her head back and chest arched. (Def's L.R. 56.1(A)(3) Stmnt. of Mat. Facts, at ¶65.) When describing the incident, Kolar stated that plaintiff was coherent and claimed that her feet were cold. (Def's L.R. 56.1(A)(3) Stmnt. of Mat. Facts, at ¶65.)

[9]Defendant was not disciplined for her absence. (Def's L.R. 56.1(A)(3) Stmnt. of Mat. Facts, at ¶¶57, 70.)

Plaintiff stated that she informed White that she did not want him to telephone or visit her while she was away from work on leave. (Pl's Stmnt. of Add'l Mat. Facts, at ¶30; Def's Resp. to Pl's Stmnt. of Add'l Mat. Facts, at ¶30.) Nevertheless, plaintiff telephoned Kolar while on leave to report that White had visited her at her home without having been invited on two occasions. (Def's L.R. 56.1(A)(3) Stmnt. of Mat. Facts, at ¶51; Pl's Stmnt. of Add'l Mat. Facts, at ¶31; Def's Resp. to Pl's Stmnt. of Add'l Mat. Facts, at ¶31.) Plaintiff asked Kolar to document that (1) both incidents occurred during business hours, (2) White had not been invited on either occasion, and (3) White had made inappropriate remarks to plaintiff. (Def's L.R. 56.1(A)(3) Stmnt. of Mat. Facts, at ¶52; Pl's Stmnt. of Add'l Mat. Facts, at ¶31; Def's Resp. to Pl's Stmnt. of Add'l Mat. Facts, at ¶31.) Plaintiff believes that White visited her for the purpose of rekindling "a day of sex." (Def's L.R. 56.1(A)(3) Stmnt. of Mat. Facts, at ¶53; Pl's Resp. to Def's L.R. 56.1(A)(3) Stmnt. of Mat. Facts, at ¶53; Pl's Stmnt. of Add'l Mat. Facts, at ¶38; Def's Resp. to Pl's Stmnt. of Add'l Mat. Facts, at ¶38.) In support, plaintiff stated that White attempted to touch, hug, kiss, and fondle plaintiff while at her home. (Def's L.R. 56.1(A)(3) Stmnt. of Mat. Facts, at ¶54; Pl's Stmnt. of Add'l Mat. Facts, at ¶¶39, 67; Def's Resp. to Pl's Stmnt. of Add'l Mat. Facts, at ¶39.)

After receiving plaintiff's complaint, Kolar met with White to question him about the complained-of conduct. (Def's L.R. 56.1(A)(3) Stmnt. of Mat. Facts, at ¶55; Pl's Stmnt. of Add'l Mat. Facts, at ¶66.) White denied plaintiff's allegations. (Def's L.R. 56.1(A)(3) Stmnt. of Mat. Facts, at ¶55; Pl's Stmnt. of Add'l Mat. Facts, at ¶66.) At that point, Kolar concluded her investigation. (Pl's Stmnt. of Add'l Mat. Facts, at ¶66.)

On October 8, 2001, plaintiff's psychologist released her to return to work on a part-time basis. (Def's L.R. 56.1(A)(3) Stmnt. of Mat. Facts, at ¶¶70-71; Pl's Stmnt. of Add'l Mat. Facts,

at ¶19.) On that same day, plaintiff informed Kolar that she needed to resume working part-time even though she was having three seizures per day. (Def's L.R. 56.1(A)(3) Stmnt. of Mat. Facts, at ¶71; Pl's Stmnt. of Add'l Mat. Facts, at ¶28.) After receiving plaintiff's medical release on October 8, 2001, Kolar informed plaintiff that Kolar would need to speak to both Wallace and Tritt about plaintiff's request and position.[10] (Pl's Stmnt. of Add'l Mat. Facts, at ¶¶22, 24.) Kolar stated that Tritt later informed her that plaintiff's position was being eliminated.[11] (Pl's Stmnt. of Add'l Mat. Facts, at ¶¶28, 64; Def's Resp. to Pl's Stmnt. of Add'l Mat. Facts, at ¶64.)

In October 2001, defendant laid off approximately ten employees.[12] (Def's L.R. 56.1(A)(3) Stmnt. of Mat. Facts, at ¶20.) Plaintiff was among those employees laid off.[13] (Pl's Stmnt. of Add'l Mat. Facts, at ¶26.) Other laid off employees included Penny Rae, Leo Heideman, Judy Blackmore, Sonnie McCallips, and Dan Schroeder. (Pl's Stmnt. of Add'l Mat. Facts, at ¶26.)

---

[10]Tritt stated that he generally referred questions or requests concerning disabilities and accommodations to Kolar. (Pl's Stmnt. of Add'l Mat. Facts, at ¶53.) He added that he did not speak to Wallace about those topics. (Pl's Stmnt. of Add'l Mat. Facts, at ¶54.) In line with those statements, Tritt claims that he (1) never participated in any meeting concerning an employee's request for a disability accommodation and (2) was unaware of any instances when defendant made any concessions in response to such a request. (Pl's Stmnt. of Add'l Mat. Facts, at ¶¶55-56; Def's Resp. to Pl's Stmnt. of Add'l Mat. Facts, at ¶55.) Nevertheless, he acknowledged that he may have learned that plaintiff requested permission to work on a part-time basis on October 8, 2001. (Pl's Stmnt. of Add'l Mat. Facts, at ¶57.)

[11]Kolar added that the Department Manager is responsible for deciding whether an employee will be permitted to work on a part-time basis. (Pl's Stmnt. of Add'l Mat. Facts, at ¶65.)

[12]Defendant employed approximately 130 employees in 2001 and approximately 102 employees in 2004. (Def's L.R. 56.1(A)(3) Stmnt. of Mat. Facts, at ¶¶19, 21.) Plaintiff did not know whether defendant had hired any new employees after October 2001. (Def's L.R. 56.1(A)(3) Stmnt. of Mat. Facts, at ¶39.)

[13]Plaintiff's job functions were assumed by Beyer and Kadet. (Def's L.R. 56.1(A)(3) Stmnt. of Mat. Facts, at ¶34.)

As part of the reduction in force, Kolar prepared a list of all of defendant's employees to be distributed to those employees being laid off; the employees selected for layoff were identified by asterisks.[14] (Def's L.R. 56.1(A)(3) Stmnt. of Mat. Facts, at ¶29; Pl's Stmnt. of Add'l Mat. Facts, at ¶63; Def's Resp. to Pl's Stmnt. of Add'l Mat. Facts, at ¶63.) Each employee was identified by position and birth date. (Pl's Stmnt. of Add'l Mat. Facts, at ¶63; Def's Resp. to Pl's Stmnt. of Add'l Mat. Facts, at ¶63.) Kolar stated that an asterisk was placed by plaintiff's position and birth date after plaintiff gave notice of her medical release to return to work part-time.[15] (Pl's Stmnt. of Add'l Mat. Facts, at ¶63; Def's Resp. to Pl's Stmnt. of Add'l Mat. Facts, at ¶63.)

Wallace stated that he selected two employees for layoff: plaintiff and Schroeder based upon their being less senior. (Def's L.R. 56.1(A)(3) Stmnt. of Mat. Facts, at ¶25; Pl's Stmnt. of Add'l Mat. Facts, at ¶45.) Within the Contracts Department, plaintiff had the least amount of seniority among the clerical staff and Schroeder had the least amount of seniority among the customer managers.[16] (Def's L.R. 56.1(A)(3) Stmnt. of Mat. Facts, at ¶¶25, 31.) On October 9, 2001, Wallace and Tritt telephoned plaintiff at her home to inform her that she had been selected for

---

[14]Wallace did not recall having ever seen the list when it was shown to him during his deposition. (Pl's Stmnt. of Add'l Mat. Facts, at ¶47; Def's Resp. to Pl's Stmnt. of Add'l Mat. Facts, at ¶47.)

[15]Plaintiff stated that on October 9, 2001 Rae provided her with a copy of the list that did not include an asterisk by plaintiff's position and birth date. (Def's L.R. 56.1(A)(3) Stmnt. of Mat. Facts, at ¶26; Pl's Stmnt. of Add'l Mat. Facts, at ¶¶20, 22; Def's Resp. to Pl's Stmnt. of Add'l Mat. Facts, at ¶20.) With respect to this issue, Kolar explained that the other employees who were being laid off were not informed that plaintiff was also scheduled for layoff because plaintiff was on medical leave. (Pl's Stmnt. of Add'l Mat. Facts, at ¶63; Def's Resp. to Pl's Stmnt. of Add'l Mat. Facts, at ¶63.)

[16]Plaintiff stated that she did not know how employees were selected for layoff and could only speculate concerning defendant's decisionmaking process. (Def's L.R. 56.1(A)(3) Stmnt. of Mat. Facts, at ¶30.)

layoff. (Def's L.R. 56.1(A)(3) Stmnt. of Mat. Facts, at ¶27; Pl's Stmnt. of Add'l Mat. Facts, at ¶23.) When plaintiff returned to work to retrieve her personal belongings on October 10, 2001, Tritt provided her with a copy of the list of employees selected for layoff. (Def's L.R. 56.1(A)(3) Stmnt. of Mat. Facts, at ¶28; Pl's Stmnt. of Add'l Mat. Facts, at ¶¶21-23.) On the copy provided by Tritt, an asterisk appeared next to plaintiff's position and birth date, denoting that the position was being eliminated. (Pl's Stmnt. of Add'l Mat. Facts, at ¶¶20-22; Def's Resp. to Pl's Stmnt. of Add'l Mat. Facts, at ¶20.) Plaintiff stated that after she was laid off and through December 2001 she had many seizures and was unable to drive. (Def's L.R. 56.1(A)(3) Stmnt. of Mat. Facts, at ¶76; Pl's Stmnt. of Add'l Mat. Facts, at ¶25.)

Plaintiff claims that she was terminated because of her illness. (Def's L.R. 56.1(A)(3) Stmnt. of Mat. Facts, at ¶75.) She also believes that defendant should have allowed her to work on a part-time basis for at least one month and then re-evaluated her status at a later time.[17] (Def's L.R. 56.1(A)(3) Stmnt. of Mat. Facts, at ¶73.) At the same time, however, Plaintiff does not contend that another employee should have been terminated in her place or to enable defendant to accommodate her request to work on a part-time basis.[18] (Def's L.R. 56.1(A)(3) Stmnt. of Mat. Facts, at ¶74.)

*Analysis*

---

[17]Plaintiff's job could probably have been performed in October 2001 on a four-hour-a-day basis for twenty days. (Pl's Stmnt. of Add'l Mat. Facts, at ¶59; Def's Resp. to Pl's Stmnt. of Add'l Mat. Facts, at ¶59.)

[18]Plaintiff noted that a need for her job functions to be performed existed after her termination. (Pl's Stmnt. of Add'l Mat. Facts, at ¶58.) Additionally, plaintiff stated that most of defendant's contracts were for a duration of one, five, or ten year(s) and that she was not aware of any major contracts being cancelled after September 11, 2001. (Pl's Stmnt. of Add'l Mat. Facts, at ¶¶40-41; Def's Resp. to Pl's Stmnt. of Add'l Mat. Facts, at ¶¶40-41.)

## I. Title VII – Sex Discrimination (Hostile Work Environment)

In her complaint, plaintiff alleges that (1) she "was subjected to continued sexual advances by. . .White[,]" (2) "Defendant was aware of the sexual harassment,. . .but. . .failed to take any corrective action to protect. . .Plaintiff[,]" and (3) "Defendant discriminated against [her] based on her sex as a female, as male workers. . .were not subjected to sexual advances or harassment." In response, defendant argues, *inter alia*, that White's "advances were the result of White's attempt to rekindle [his] consensual relationship with Plaintiff and not her gender."

Title VII prohibits an employer from "'discriminat[ing] against any individual with respect to h[er] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin[.]'" *Wyninger v. New Venture Gear, Inc.*, 361 F.3d 965, 975 (7th Cir. 2004) (citation omitted). This includes "'requiring people to work in a discriminatorily hostile or abusive environment.'" *Wyninger*, 361 F.3d at 975 (citation omitted); *see also Cooper-Schut v. Visteon Auto. Sys.*, 361 F.3d 421, 426 (7th Cir. 2004) (same). A hostile or abusive environment "is one that is 'permeated with discriminatory intimidation, ridicule and insult.'" *Cooper-Schut*, 361 F.3d at 426 (citation omitted).

In order to state a *prima facie* hostile work environment claim under Title VII, plaintiff "must establish that: (1) she was subjected to unwelcome sexual advances, requests for sexual favors or other verbal or physical conduct of a sexual nature; (2) the conduct was severe or pervasive enough to create a hostile work environment; (3) the conduct was directed at her because of her sex; and (4) there is a basis for employer liability." *Rhodes v. Ill. Dep't of Transp.*, 359 F.3d

498, 505 (7th Cir. 2004) (citation omitted); *see also Cooper-Schut*, 361 F.3d at 426 (same). Because plaintiff has presented no evidence to establish the third or fourth elements, Defendant is entitled to summary judgment. *See Wyninger*, 361 F.3d at 975 ("In order to maintain an actionable claim of hostile work environment, [a plaintiff] must first demonstrate that a supervisor or coworker harassed her because of her sex.") (citation omitted); *Hildebrandt v. Ill. Dep't of Natural Res.*, 347 F.3d 1014, 1034 (7th Cir. 2003) ("[T]he harassment must have 'occurred because of the sex of the complainant. . . .'") (citation omitted); *Berry v. Delta Airlines, Inc.*, 260 F.3d 803, 808 (7th Cir. 2001) ("Inappropriate conduct that is 'inflicted regardless of sex [] is outside the statute's ambit,'. . .and an employer cannot be held liable for creating or condoning a hostile working environment unless the hostility is motivated by gender.") (citations omitted).

Defendant argues plaintiff has failed to identify any evidence that suggests White's behavior was motivated by plaintiff's gender.[19] Instead, it contends the record is clear that White's conduct toward plaintiff was motivated by his desire to resume and continue their previous relationship. Plaintiff concedes that she engaged in a consensual, sexual relationship with White for nearly two years. Plaintiff further acknowledges that after she ended that relationship in approximately April or May 2001 White would remark "Oh, I miss you" and "I want to be with you" and visited her while she was on leave for the purpose of rekindling "a day of sex." These facts represent the only evidence of White's motivation and, when coupled with the facts concerning

---

[19]Plaintiff argues (without explanation) that White's consensual relationship with Stacy Schafer suggests that White's conduct toward plaintiff was motivated by plaintiff's gender. The court finds that the evidence does not support that conclusion. Plaintiff also asserts (again, without explanation) that her uncorroborated testimony concerning White's alleged conduct with respect to Nichols is sufficient to establish a genuine issue of material fact as to White's motivation. The court disagrees. *See, e.g., Salvadori*, 293 F.3d at 996 (plaintiff "must present definite, competent evidence in rebuttal. . . .") (citation omitted).

plaintiff's consensual relationship with White, arguably lead to the conclusion White's behavior toward plaintiff was motivated by their personal history as opposed to plaintiff's sex. *See, e.g. Galloway v. General Motors Serv. Parts Operations*, 78 F.3d 1164, 1168 (7th Cir. 1996). However, the court need not decide this issue on that basis.

Plaintiff has shown no basis for employer liability. The evidence is that she did not bring the harassing behavior to defendant's attention until after the incidents of White coming to her house while she was on disability leave. She phoned Kolar to tell of these incidents, Kolar discussed them with White, and there is no evidence White had any contact with plaintiff afterwards. While plaintiff asserts Kolar did nothing, the facts show Kolar talked with White and his contact with plaintiff stopped. There is no basis to find defendant liable. Because plaintiff cannot present a *prima facie* hostile work environment claim under Title VII, defendant is entitled to summary judgment. *See, e.g., Cerutti*, 349 F.3d at 1060; *Salvadori*, 293 F.3d at 996; *Basith*, 241 F.3d at 926.

## II.     Title VII – Retaliation

Count I of plaintiff's complaint includes an allegation that defendant terminated her in retaliation "for reporting sexually offensive conditions in the work place. . . ." Under Title VII, "'unlawful retaliation occurs when an employer takes an adverse employment action against an employee for opposing impermissible discrimination.'" *Wyninger*, 361 F.3d at 980-81 (citation omitted); *Rhodes*, 359 F.3d at 508 ("Title VII prohibits an employer from discriminating against an employee because that employee has opposed any practice deemed unlawful under the Act.") (citation omitted). To defeat defendant's summary judgment motion, plaintiff must "establish a prima facie case of retaliation. . .using either the direct method or the indirect method." *Rhodes*, 359 F.3d at 508 (citation omitted).

As an initial matter, the court agrees with defendant that plaintiff effectively abandoned her retaliation claim. During her deposition, plaintiff stated that she was terminated because of her disability. This statement wholly contradicts the retaliation allegations in her complaint. Nevertheless, the court will proceed with its analysis of the merits of her claim.

It is settled that "there are two distinct ways for [plaintiff] to pursue a retaliation charge." *Wyninger*, 361 F.3d at 981. Under the direct method, plaintiff may provide direct evidence (*e.g.*, "evidence that, if believed by the trier of fact, would prove the fact in question 'without reliance on inference or presumption[]'") or circumstantial evidence (*e.g.*, "evidence that allows a jury to infer intentional discrimination by the decisionmaker") to establish "that she engaged in protected activity and suffered an adverse employment action as a result" of doing so. *Wyninger*, 361 F.3d at 981 (citations omitted); *Rogers v. City of Chicago*, 320 F.3d 748, 753-54 (7th Cir. 2003) (citations omitted). Here, the record does not include any direct or circumstantial evidence from which to conclude that plaintiff was terminated because she complained about White's conduct.[20] Instead, her retaliation claim appears to rest on the fact that defendant terminated her several months after she made her complaint. By itself, that fact is not enough to survive defendant's summary

---

[20]Plaintiff's statements that most of defendant's contracts were for a duration of one, five, or ten year(s) and that she was not aware of any major contracts being cancelled after September 11, 2001 do not establish a *prima facie* case of retaliation under the direct method. An unsupported statement concerning the possible terms of various unspecified contracts sheds no light on their dates of expiration. Indeed, the record is void of any evidence concerning when defendant's contracts actually expired. And plaintiff's statement that she is unaware of any major contracts being cancelled after September 11, 2001 simply confirms that plaintiff has no knowledge of any cancelled contracts. It is not evidence that contracts were not cancelled after that date. *See, e.g., Salvadori*, 293 F.3d at 996 (plaintiff "must present definite, competent evidence in rebuttal. . . .") (citation omitted).

judgment motion.[21] *See Wyninger*, 361 F.3d at 981 ("There is no bright-line rule as to the amount of evidence necessary to survive summary judgment under the direct method, but it is clear that 'mere temporal proximity" is not enough to establish a genuine issue of material fact.") (citation omitted).

Plaintiff's claim does not fare any better under the indirect method. The indirect method requires plaintiff to "show that (1) she engaged in a statutorily protected activity; (2) she performed her job according to her employer's legitimate expectations; (3) despite her satisfactory job performance, she suffered an adverse action from the employer; and (4) she was treated less favorably than similarly situated employees who did not engage in statutorily protected activity." *Rhodes*, 359 F.3d at 508 (citations omitted); *see also Wyninger*, 361 F.3d at 981 (same). However, the record is void of any evidence that would establish that "she was treated less favorably than similarly situated employees" who did not complain of sexual harassment. In fact, plaintiff has failed to identify even one employee to whom she was similarly situated. This is "fatal" to plaintiff's retaliation claim. *Hudson v. Chicago Transit Auth.*, 375 F.3d 552, 560 (7th Cir. 2004) (citation omitted); *see also Rogers*, 320 F.3d at 755-56 (same).

"To determine whether employees are similarly situated for the purposes of analyzing a Title VII retaliation claim, the employees must be 'directly comparable in all material respects.'" *Hudson*, 375 F.3d at 561 (citation omitted); *see also Rogers*, 320 F.3d at 755 (same). Therefore, the court may compare "characteristics such as education, experience, performance, qualifications, and

---

[21]In her brief, plaintiff argues that her retaliation claim survives defendant's motion because of circumstantial evidence concerning her disability accommodation request. More specifically, she cites "the timing of her disability request and her termination." As an initial matter, this argument does not support the retaliation allegations in her complaint. Furthermore, it is not sufficient to preclude the entry of summary judgment. *See Wyninger*, 361 F.3d at 981.

conduct." *Zaccagnini v. Chas. Levy Circulating Co.*, 338 F.3d 672, 675-76 (7th Cir. 2003) (citation omitted). The court may also consider "whether the employees. . .held the same job description. . .[and] were subject to the same standards. . . ." *Ajayi v. Aramark Bus. Servs., Inc.*, 336 F.3d 520, 532 (7th Cir. 2003) (citation omitted). In her brief, plaintiff argues that she "was in all material respects similarly situated to. . .Beyer,. . .Kadet,. . .Rice and. . .Johnson" because (1) all five employees were "cross trained" and shared a common supervisor (Tritt) and (2) plaintiff performed certain job functions normally performed by Kadet or Rice when Kadet or Rice was absent. The court does not agree.

Beyer, Rice, and Johnson did not share plaintiff's job title or description, a fact that plaintiff wholly disregards. This alone is sufficient to support a finding that plaintiff was not similarly situated to Beyer, Rice, and Johnson.[22] *See Ajayi*, 336 F.3d at 532; *Hoffman-Dombrowski v. Arlington Int'l Racecourse, Inc.*, 254 F.3d 644, 651 (7th Cir. 2001) (employees who "did not hold the same or equivalent positions" were not similarly situated). Additionally, the record is void of any evidence from which a jury could compare the education, experience, performance, qualifications, and conduct of Beyer, Kadet, Rice, and Johnson to that of plaintiff, including whether any of the four complained of sexual harassment while employed by defendant. For all of these reasons, the court must conclude that plaintiff has not satisfied her burden of establishing that Beyer, Kadet, Rice, or Johnson were similarly situated to plaintiff.[23] Accordingly, summary judgment will

---

[22]Although Kadet and plaintiff did share the same job title on the date that plaintiff was terminated, they worked in different departments. Plaintiff makes no effort to explain the significance of this difference and the record is silent on the issue.

[23]The court's analysis and conclusion applies equally to plaintiff's alternate theory that defendant terminated her in retaliation for her disability accommodation request.

17

be entered in favor of defendant on plaintiff's retaliation claim.

### III. Americans with Disabilities Act – Disability Discrimination (Failure to Accommodate and Disparate Treatment)

Plaintiff's complaint alleges: (1) plaintiff was terminated because of her disability and (2) defendant failed to reasonably accommodate plaintiff's disability. Defendant responds that plaintiff is unable to present a *prima facie* case of disability discrimination for either claim. Under the ADA, "there are two distinct categories of disability discrimination claims: failure to accommodate and disparate treatment." *Basith*, 241 F.3d at 927 (citation omitted); *see also Wright v. Ill. Dep't of Corrs.*, 204 F.3d 727, 730 (7th Cir. 2000) (same).

#### A. Failure to Accommodate

The burden-shifting approach is not applicable to failure to accommodate claims. *See Hoffman v. Caterpillar, Inc.*, 256 F.3d 568, 572 (7th Cir. 2001). Instead, the

> prima facie case mirrors the statutory elements. . . .[A] plaintiff who has suffered an adverse employment action must show that: (1) she was or is disabled; (2) the defendant was aware of her disability; (3) she was otherwise qualified for her job. . .; and (4) the disability caused the adverse employment action (a factor which is implied if not stated). . . .

*Foster v. Arthur Andersen, LLP*, 168 F.3d 1029, 1032 (7th Cir. 1999) (citations omitted). Defendant concedes that plaintiff's evidence sufficiently establishes the first and third elements for the purpose of contesting defendant's motion. Additionally, the court finds that sufficient evidence exists to establish that defendant was aware of plaintiff's disability prior to refusing her disability accommodation request and terminating her employment. That leaves only the issue of whether defendant wrongfully refused plaintiff's disability accommodation request and terminated her employment because of her disability.

To make this determination, the court applies a "motivating factor" standard. *See Foster*, 168 F.3d at 1033-34. Under that standard, "the alleged disability. . .need not be the employer's only reason for termination. . . .But it must be a substantial factor. Mere awareness of the plaintiff's disability, or simply thinking about it in discriminatory terms, is not enough." *Id.* at 1033 (citations omitted). In other words,

> the forbidden criterion must be a significant reason for the employer's action. It must make such a difference in the outcome of events that it can fairly be characterized as the catalyst which prompted the employer to take the adverse employment action, and a factor without which the employer would not have acted.

*Id.* at 1033-34 (citation omitted).

On October 8, 2001, plaintiff's psychologist released her to return to work on a part-time basis and plaintiff informed Kolar of the same. After receiving plaintiff's medical release, Kolar informed plaintiff that Kolar would need to speak to both Wallace and Tritt about plaintiff's request and position. On October 9, 2001, Wallace and Tritt telephoned plaintiff at her home to inform her that she had been selected for layoff. This sequence of events is not sufficient by itself to establish a genuine issue of material fact as to defendant's motivation for refusing plaintiff's disability accommodation request and terminating her employment. While there is temporal proximity between plaintiff's request to return part-time and defendant advising her of the lay-off, temporal proximity is not enough. *See, Buie v. Quad/Graphics, Inc.*, 366 F.3d 496, 506-07 (7th Cir. 2004). The evidence that Wallace made the decision in September, prior to plaintiff's request to work part-time, is unrebutted.

Defendant contends: (1) plaintiff was terminated because she was the least senior order processing clerk in the Contracts Department and (2) the decision to terminate plaintiff was

made by Wallace in September 2001. *See, e.g.*, (Def's L.R. 56.1(A)(3) Stmnt. of Mat. Facts, at ¶¶22-24.) Furthermore, defendant argues that it did not accommodate her request to work part-time because Wallace had already decided to eliminate her position as part of a company-wide reduction in force and no other positions were available. *See, e.g.*, (Def's L.R. 56.1(A)(3) Stmnt. of Mat. Facts, at ¶¶32-33, 72.) Plaintiff has not presented any evidence that could disprove defendant's basis for its decision.

### B. Disparate Treatment

Plaintiff does not present evidence that would support proceeding under the direct method of proving disparate treatment. She does not present direct or circumstantial evidence that she was laid off due to her disability. She, therefore, must proceed under the indirect method. To establish a *prima facie* case of disparate treatment under the ADA in a reduction in force case she must show (1) she is a member of a protected class; (2) she was adequately performing her job; (3) she was laid off in a reduction in force; and (4) employees outside the protected class were treated more favorably. Cable v. Ivy Tech State College, 200 F.3d 467, 478 (7th Cir. 1999). Plaintiff has failed to establish the fourth prong.[24] There is no evidence in the record to support a finding that employees without disabilities were treated more favorably.

For the foregoing reasons, defendant's motion for summary judgment is granted. This case is dismissed in its entirety with prejudice.

---

[24]Plaintiff's speculative testimony that everyone who was laid off (1) was sick in some way, (2) had experienced recent health problems, (3) had a significant other with health problems, or (4) was advancing in age was not considered by the court when deciding defendant's motion. *See Patterson v. Chicago Ass'n for Retarded Citizens*, 150 F.3d 719, 724 (7th Cir. 1998) ("'[A] plaintiff's speculation is not a sufficient defense to a summary judgment motion.'") (citation omitted).

DATED:    **OCT 1 2 2004**           ENTER:

HON. PHILIP G. REINHARD
United States District Judge